**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 23-cr-00058-CNS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. TIMOTHY TACONI,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Leah Perczak, Special Assistant United States Attorney and Rebecca S. Weber, Assistant United States Attorney, and defendant, Timothy Taconi, personally and through counsel, Martha H. Eskesen, submit the following Plea Agreement. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I. AGREEMENT

**A. Defendant's Obligations**

The defendant agrees to:

(1)    plead guilty to Count 1 of the Indictment charging a violation of 18 U.S.C. § 922(a)(1)(A), dealing firearms without a license;

(2)    waive certain appellate and collateral attack rights, as explained in detail below;

(3)    be liable for restitution to the SBA and participating lender in the approximate amount of $187,800, plus interest accruing through the date

**COURT**
**EXHIBIT**
**1**

> of the sentencing hearing, with additional information about
> apportionment between the SBA and participating lender being provided
> at the sentencing hearing; and

(4)    forfeiture as more fully described below.

## B. Government's Obligations

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). The government agrees to not oppose a request for a variant sentence down to 40 months. The government further agrees to move to dismiss Count 2 of the Indictment with prejudice. The government also agrees to not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado concerning covid-relief funds received by the defendant or other National Firearms Act (NFA) weapons that were sold by, or recovered from, the defendant. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a superseding indictment. The parties understand that this agreement is not binding on the Court.

The government also agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). If the defendant does not engage in prohibited conduct or otherwise implicate USSG § 3C1.1, the government agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).

2

## C. Waiver of Appeal

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the

sentence, including the manner in which that sentence is determined.  Understanding

this, and in exchange for the concessions made by the government in this agreement,

the defendant knowingly and voluntarily waives the right to appeal any matter in

connection with this prosecution, conviction, or sentence (including the restitution

order), unless it meets one of the following criteria:

(1) the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 922(a)(1)(A);

(2) the sentence exceeds the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 26; or

(3) the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how his

sentence exceeds the statutory maximum sentence.  But if one of the latter two criteria

apply, the defendant may appeal on any ground that is properly available in an appeal

that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this

prosecution, conviction, or sentence (including the restitution order) in any collateral

attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255).  This

waiver provision does not prevent the defendant from seeking relief otherwise available

in a collateral attack on any of the following grounds:

(1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

3

(2) the defendant was deprived of the effective assistance of counsel; or

(3) the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### D. Forfeiture of Assets

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but

4

are not limited to: (1) a Privately Made Firearm (PMF), gray in color AR style pistol, 5.56 caliber, bearing no serial number, (2) a Anderson Manufacturing model AM-15 AR style pistol, .223 Wylde caliber, green in color, bearing serial number 21357747, (3) a Stag Arms, Model Stag-IO AR style pistol, bearing serial number Y-000413 5, (4) twenty rounds of PPU 7.62 caliber ammunition purchased by an undercover confidential informant on January 23, 2023, (5) four silencers purchased from the defendant by an undercover confidential informant on September 28, 2022, October 25, 2022, and January 23, 2023, (6) a blue in color Anderson Manufacturing AM-15 multi caliber rifle with serial number 20039782, (7) a gray in color 762 x 39 PMF with no serial number, (8) a white in color PMF Black Hat MFG Pistol 300 Blackout with no serial number, (9) a blue in color Short Barrel Rifle (SBR) Anderson Manufacturing AM-15 with serial number 20039779, (10) a gold/brown in color SBR PMF with no serial number, (11) a tan in color SBR Anderson Manufacturing AM-15 with serial number 20039331, (12) a bronze in color SBR Anderson Manufacturing AM-15 with serial number 20039314, (13) a gray in color SBR PMF with no serial number, (14) a black in color SBR PMF with no serial number, (15) a blue in color SBR Anderson Manufacturing AM-15 multi caliber with serial number 20039771, (16) a turquoise in color SBR PMF with no serial number, (17) a pink in color SBR MF 556 caliber with no serial number, (18) a white in color American Tactical SBR Mil Sport Multi Caliber with serial number MSA080224, (19) an orange in color Harley Davidson SBR 300 Blackout with no serial number, (20) a tan in color SBR American Tactical Mil Sport Multi Caliber with serial number MSA080189, (21) a Colt M-4, 22 caliber rifle with serial number WJ040533, (22) a Ballistic Advantage

Model DCP3 rifle with serial number BA03142, (23) a Spikes Tactical Model ST-15 rifle with serial number BH0056, (24) an Anderson Manufacturing AM-15 SBR with serial number 20039324, (25) a gray in color PMF rifle with no serial number, (26) an unknown Industries Inc. North Charleston, SC Mod A 10 Multi Caliber with serial number CBC10A00113, (27) a white in color Receiver Anderson Manufacturing AM 15 with serial number 20029238, (28) a silver and black in color SBR PMF with no serial number, (29) a silver and black in color PMF rifle with no serial number, (30) a SBR Model AT 15 Multi Caliber Manufactured by A-Tac Arms with serial number 20181, (31) a Sig P365 9mm with serial number 66B847758, (32) 11 rounds of 9mm assorted ammunition seized during a search of the defendant's residence on February 23, 2023, (33) 217 silencers seized during a search of the defendant's residence on February 23, 2023, and (34) various firearms parts seized during a search of the defendant's residence on February 23, 2023.  The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.  The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters.  Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his/her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him/her if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

6

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

### E. Restitution

The defendant agrees pursuant to 18 U.S.C. §§ 3663A(a)(3) and 3663(a)(3) to pay restitution comprised of: (1) $185,900 that the defendant received from his fraudulent Economic Injury Disaster Loan ("EIDL") and Paycheck Protection Program ("PPP") loan applications; (2) the PPP processing fee totaling $1,800 that the SBA paid to the third-party lender in connection with the defendant's fraudulent PPP loan; (3) the $100 UCC filing fee that the SBA incurred in connection with the defendant's fraudulent EIDL; and (4) interest accruing through the date of the sentencing hearing. Upon entry of the restitution order for the total amount, the U.S. Attorney's Office shall credit the restitution amount due for all payments made on Loan Nos. 2129437800 and 6910347303 prior to and after sentencing based on information provided by the SBA, and will only collect up to the amount of the outstanding debt owed to the SBA (or the participating lender) on Loan Nos. 2129437800 and 6910347303.

## II. **ELEMENTS OF THE OFFENSE**

The parties agree that the elements of 18 U.S.C. § 922(a)(1)(A) are as follows:

*First:* the defendant was a dealer in firearms on or about August 2020, through on or about February 5, 2023, engaged in the business of selling firearms at wholesale or retail;

7

*Second:*  the defendant engaged in such business without a license issued under federal law; and

*Third:*  the defendant did so willfully, that is, that the defendant was dealing in firearms with knowledge that his conduct was unlawful.

<u>Note</u>: The term "firearm" means any weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosive.  The term also includes the frame or receiver of any such weapon, or any firearm muffler or silencer, or destructive device.

## III.  <u>STATUTORY PENALTIES</u>

The maximum statutory penalty for a violation of 18 U.S.C. § 922(a)(1)(A) is not more than 5 years' imprisonment; not more than a $250,000 fine, or both; not more than 3 years' supervised release; and a $100 special assessment fee.

## IV.  <u>COLLATERAL CONSEQUENCES</u>

The conviction may cause the loss of civil rights, including but not limited to the right to possess firearms, vote, hold elected office, and to serve on a jury.

## V.  <u>STIPULATION OF FACTS</u>

The factual basis for this plea is set forth below.  Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts that may be included below which are pertinent to those considerations and computations.  To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at

8

the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree the government would be able to prove the following facts at trial:

### Revocation of FFL

The defendant previously operated as a Federal Firearm Licensee (FFL) under the name A-TAC Arms.  On September 7, 2018, the defendant was served with a "Warning Notice of Gun Show Operating in Violation of Law," along with a pamphlet titled "Important Notice of FFLs and Other Participants at Gun Shows."  When he was served, the defendant acknowledged receipt of the documents and admitted to conducting personal firearm sales at gun shows in Wyoming, Iowa, and Kansas.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) then conducted a compliance inspection of the defendant's firearms business, A-TAC Arms.  During that inspection, law enforcement learned that the defendant would log firearms out to himself before gun shows, sell the firearms out of state, and would have customers complete an ATF Form 4473, but would not conduct background checks of the customers.

Based on this, on November 22, 2019, his FFL was revoked.

On February 18, 2021, ATF served the defendant with a Cease-and-Desist Notice for manufacturing and dealing in firearms without a license.  The defendant refused to acknowledge receipt of the Notice.

### Firearms Sales and Firearms Shows

After the defendant's FFL was revoked, the defendant was witnessed on several occasions selling firearms at firearms shows as detailed below.

*Abilene Texas, August 2020 and May 2022*

Alexander Wakal, a FFL, told ATF he witnessed the defendant selling firearms at gun shows on at least two occasions in Abilene, Texas. Wakal stated that in August 2020, at a gun show in Abilene, the defendant approached Wakal and his wife, Leona, and asked if they would conduct firearms transfers on his behalf because he was from Colorado. The Wakals believed the defendant to have an FFL because he had business cards and tags on firearms that said "A-TAC Arms." However, when the defendant brought a customer over to the Wakals table to conduct a transfer, the defendant told them that he had applied for an FFL, but it had not been approved yet. The Wakals agreed to complete that one transfer, but said they were uncomfortable conducting any more. According to L. Wakal, the defendant stated that he would sell firearms to customers at the gun show without completing any paperwork. They stated that the defendant had between 100-120 firearms for sale.

The Wakals stated they also witnessed the defendant at a gun show in Abilene, TX on May 21, 2022. They stated that he was selling 30-40 pistols and long guns. [1]During the show, A. Wakal spoke with the defendant and saw him sell firearms directly to customers without going through an FFL.

---

[1] "Mr. Taconi does not agree that he "sold" this many pistols and long guns at this Abilene show.

*Las Cruces, New Mexico, August 2022*

ATF agents also interviewed an individual named Dustin Farnsworth, who stated that he witnessed the defendant selling firearms at a gun show on August 27, 2022 in Las Cruces, New Mexico.  Farnsworth stated that the defendant had 25 firearms on display, to include 18 AR style pistols, 5 AR style rifles, 2 shotguns, and 5 solvent trap kits.  He stated that the defendant asked him to conduct background checks for firearms transfers, and that he completed two firearms transfer for the defendant.  He also stated that he observed the defendant sell approximately six firearms without completing background checks.[2]

On August 27, 2022, ATF SA Richard Chmielewski received information that a former FFL, the defendant, was selling firearms and solvent traps at the Las Cruces Gun Show.  The defendant had come to the attention of ATF when two different FFLs contacted ATF to express their concerns about the defendant selling firearms without an FFL at the show.  SA Chmielewski went to the show and was able to identify the defendant at a table with several different types of firearms, as well as a solvent trap.

SA Chmielewski witnessed a transaction between the defendant and a couple where the individuals did not fill out an ATF form 4473.

*Rio Rancho, New Mexico, September 2022*

On September 10, 2022, Farnsworth informed ATF that the defendant was at a gun show in Rio Rancho, New Mexico.  Farnsworth stated that the defendant was displaying more than 25 firearms and one solvent trap.

---

[2] Mr. Taconi disputes that he sold six firearms at this show.

11

*Aurora, Colorado, September 2022*

On September 3 and 4, 2022, ATF Industry Operation Investigator (IOI) Gregory Paa witnessed the defendant at the Tanner Gun Show in Aurora, Colorado. IOI Paa stated that he was at the guns how in an official compacity. IOI Paa stated that the defendant was displaying 15-20 AR style pistols. He stated that the defendant had a sign that read "A-TAC" and also had business cards on his table.

*Denver, Colorado, October 2022* ✉ RSW

On October 1, 2022, a confidential ~~information~~ Informant (CI) attended a gun show in MME Denver, Colorado and observed the defendant displaying and attempting to sell firearms. The CI spoke with the defendant about purchasing firearms. During that conversation, the defendant provided the CI with a business card which read, "A-TAC Arms, LLC." The CI estimated that he had between 20-25 firearms for sale.

*Yuma Arizona, November 2022*

On November 6, 2022, ATF Area Supervisor (AS) Juan Lopez attended a gun show in Yuma, Arizona on behalf of ATF. AS Lopez saw the defendant selling firearms at the show. An FFL at the gun show had also complained about the defendant selling firearms silencers.

AS Lopez approached the defendant for an interview and identified himself as employee of ATF. During the interview, the defendant told AS Lopez that he had an FFL, A-TAC, and was licensed out of Colorado. He stated that he was in good standing with ATF in Colorado. He also stated that the firearms he was selling were from his

personal collection.  AS Lopez identified 10-15 firearms for sale, with only one bearing markings.

*Denver, Colorado, February 2023*

On February 4 and 5, 2023, IOI Abraham Kazerani attended a gun show in Denver, Colorado in his official capacity and on behalf of ATF.  During that gun show, IOI Kazerani saw the defendant selling firearms.  He estimated that he was selling 20-25 AR style firearms, along with 11-15 silencers in the form of solvent trap kits.

### **Undercover purchases**

ATF also set up a number of controlled purchases from the defendant with an undercover CI.

On September 28, 2022, an undercover CI purchased a silencer from the defendant from his residence in Aurora, CO for $400.  The silencer was sent for examination, and it was determined that this device was a silencer, and specifically a firearm as defined in 26 U.S.C. § 5845(a)(7).  The silencer was not registered with the NFA as it had no mark of identification or serial number as required and necessary for registration.

On October 23, 2022, an undercover CI purchased an AR style firearm from the defendant at his residence in Aurora, CO for $2,450.

On October 25, 2022, an undercover CI purchased a firearm and two silencers from the defendant in Fort Collins, CO for $3,170.  The silencers were sent for examination, and it was determined that the devices were a silencer, and specifically a firearm as defined in 26 U.S.C. § 5845(a)(7).  The silencers were not registered with the

13

NFA as it had no mark of identification or serial number as required and necessary for registrations.

On January 23, 2023, an undercover CI purchased an AR style rifle and a firearm silencer from the defendant from his residence in Aurora for $3,925. The silencer was sent for examination, and it was determined that this device was a silencer, and specifically a firearm as defined in 26 U.S.C. § 5845(a)(7). The silencer was not registered with the NFA as it had no mark of identification or serial number as required and necessary for registration.

The defendant admits that beginning no later than on or about August 2020, through on or about February 5, 2023, he was a dealer in firearms, engaged in the business of selling firearms wholesale or at retail. He further admits that he engaged in such business without a license issued to him under federal law. Lastly, he admits that he did so willfully, that he was dealing in firearms with the knowledge that his conduct was unlawful. All events occurred in the State of Colorado.

### Search of the defendant's residence

On February 23, 2023, a federal search warrant was executed at the defendant's residence. During that search, law enforcement located and seized approximately 33 firearms, 217 silencers, ammunition, and a variety of firearms parts.

### Covid loan fraud

14

During the COVID-19 pandemic, the defendant obtained loan relief for A-TAC Arms.[3]

On or about March 31, 2020, the defendant filed an application for a COVID-19 Economic Injury Disaster Loan (EIDL) on behalf of A-TAC Arms.  In the application, the defendant stated that he was the 100% owner of A-TAC Arms and that he operated the business out of his residence.  The defendant falsely stated in the application that A-TAC Arms earned $33,087,362.00 during the twelve months prior to January 31, 2020 and had $11,029,121.00 in expenses during the same twelve months.[4]  The defendant further certified that the "Applicant is not engaged in any illegal activity (as defined by Federal guidelines)."  This statement was false in light of the illegal activity described above.  On or about May 22, 2020, the EIDL was funded, and A-TAC Arms received $150,000 (less a $100 UCC fee).

On or about April 30, 2020, the defendant applied for a Paycheck Protection Program (PPP) loan in the amount of $36,000 on behalf of A-TAC Arms.  In the loan

---

[3] The United States Small Business Administration ("SBA") is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. On March 27, 2020, the President of the United States signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which provided emergency assistance, administered by the SBA, to small business owners suffering adverse economic effects caused by the Coronavirus ("COVID-19") pandemic. The CARES Act established several new temporary programs and expanded existing programs, including programs created or administered by the SBA.  Two sources of funding for small businesses were the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program.

[4] The defendant asserts that he mistakenly entered these exorbitant figures, but that SBA nevertheless processed and funded the loan based on these numbers. The government disagrees that such specific figures could have been entered mistakenly (indeed, the cost number is exactly one-third of the revenues) and notes that the defendant subsequently filled out two other SBA loan application documents for A-TAC Arms (on 7/30/2020 and 2/12/2021) where he provided much lower gross revenues and cost numbers for the business.

application, the defendant stated that he operated A-TAC Arms out of his residence and A-TAC Arms had four employees. The defendant certified that "The Applicant is not engaged in any activity that is illegal under federal, state, or local law." Again, this statement was false in light of the illegal activity described above. This PPP loan was approved and funded on May 5, 2020. On December 17, 2020, the defendant applied for this loan to be forgiven by the Small Business Administration. The defendant's loan forgiveness application was approved and the loan was settled by the SBA on January 11, 2021.

In addition to the two loans described above, the defendant attempted to obtain additional loans totaling an estimated $154,100. He applied for an EIDL for A-TAC Arms on July 30, 2020. He said the company had 5 employees and 2019 gross revenues of $500,000 and COGS of $250,000. He also attempted to obtain an EIDL for A-TAC Arms on February 12, 2021. He said the company had 3 employees and 2019 gross revenues of $85,600 and COGS of $27,450. He did not send the required documentation for these loans and therefore did not qualify. Nonetheless, these two loans are included in intended loss, discussed below.

## VI. ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth

16

below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government also has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the parties may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

**Violation of 18 U.S.C. § 922(a)(1)(A):**

**Offense Level**: The base guideline is § 2K2.1.

A. The base offense level for this offense is **18**. § 2K2.1(a)(5).

B. The government believes that the offense involved 200 or more firearms, and that the offense level should increase by **10** levels. § 2K2.1(b)(1)(E).[5] The

---

[5] The government has included the following firearms in its calculation: (1) In August 2020, A. Wakal sees the defendant selling between 100-120 firearms at a gun show in Abilene, TX, (2) On May 21, 2022, A. Wakal sees the defendant selling 30-40 pistols and long guns at a gun show in Abilene, TX (3) On August 27, 2022, D. Farnsworth sees the defendant selling approximately 25 firearms and 5 suppressors at a gun show in Las Cruces, New Mexico, (4) On September 10, 2022, D. Farnsworth sees the defendant selling 25 firearms and one suppressor at a gun show in Rio Rancho, New Mexico (5) On September 3 and 4, 2022, ATF IOI G. Paa sees the defendant selling between 15-20 AR style pistols at a gun show in Aurora, CO, (6) On October 1, 2022, a CI sees the defendant selling 20-25 firearms at a gun show in Denver, CO, (7) On November 6, 2022, ATF AS J. Lopez sees the defendant selling 10-15 firearms at a gun show in Yuma, Arizona, (8) On February 4 and 5, 2022, IOI A. Kazerani sees the defendant selling 11-15 silencers at a gun show in Denver, CO, (9) On September 28, 2022, an undercover CI purchased one silencer from the defendant's residence in Aurora, CO, (10) On October 23, 2022, an undercover CI purchased one firearm from the defendant's residence in Aurora, CO, (11) On October 25, 2022, an undercover CI purchased one firearm and two silencers from the defendant in Fort Collins, CO, (12) on

defendant believes that the offense involved 25-99 firearms, and that the offense level should increase by **6** levels. § 2K2.1(b)(1)(C).

C. The adjusted offense level is **28** or **24.**

D. Assuming the defendant pleads guilty, he should receive a decrease in the offense level by -2 based upon his acceptance of responsibility. § 3E1.1(a). The defendant may also receive a decrease in the offense level by -1 for timely notifying the government. § 3E1.1(b).

E. The total offense level is **25** or **21**.

**Relevant Conduct (COVID-loan fraud):**

   **Offense Level**: The base guideline is § 2B1.1.

A. The base offense level for this offense is **6**. § 2B1.1(a)(2).

B. Including the unsuccessful loan attempts, the intended loss falls between $250,000 and $550,000. Accordingly, add **12** levels. § 2B1.1(b)(1)(G). Add **2** levels because the offense involved a violation of any prior, specific administrative order or injunctive decree (the Cease-and-Desist Notice for manufacturing and dealing in firearms without a license). § 2B1.1((b)(9)(C)). Add **2** levels because the offense involved the possession of a dangerous weapon § 2B1.1(b)(16)(B).

C. The adjusted offense level is **22.**

D. The total offense level is **19.**

   **Grouping**

E. Pursuant to § 3D1.2(d), if the offense level for the firearms violation is **25**, count the highest offense level as 1 unit and add ½ unit for the covid-loan fraud (because it is 6 levels less serious than the highest offense level). Add **1** level. The total offense level would be **26.**

---

January 23, 2023, and undercover CI purchased a firearm and a silencer from the defendant at his residence in Aurora, CO, and (13) On February 23, 2023, a federal search warrant was executed at the defendant's residence during which law enforcement located and seized 33 firearms and 217 silencers. Taking the lower end estimates of the number of firearms he had displayed at gun shows, those which he sold, and those which were seized from his residence, there were 499 firearms involved in the offense charged in Count 1.

F. Pursuant to § 3D1.2(d), if the offense level for the firearms violation is **21**, count the highest offense level as 1 unit and add 1 unit for the covid-loan fraud (because it is 2 levels less serious than the highest offense level). Add **2** levels. The total offense level would be **23**.

**Criminal History Category**

G. The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties believe the defendant is in criminal history category **I**.

H. The armed career criminal adjustments tentatively do not apply. § 4B1.1.

**Guideline Ranges**

I. Assuming the defendant pleads guilty, he should receive a decrease in the offense level by -2 based upon his acceptance of responsibility. § 3E1.1(a). The defendant may also receive a decrease in the offense level by -1 for timely notifying the government. § 3E1.1(b).

J. The guideline range resulting from the estimated offense level of **26** and the estimated criminal history category of **I** is **63-78** months imprisonment. However, because the statutory maximum is 60 months, the guideline range would be **60** months. The guideline range resulting from the estimated offense level of **23** and the estimated criminal history category of **I** is **46-57** months imprisonment.

K. Pursuant to § 5E1.2, assuming the estimated offense level of **26**, the fine range for this offense would be $25,000 to $250,000, plus applicable interest and penalties. Pursuant to § 5E1.2, assuming the estimated offense level of **23**, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

L. Pursuant to § 5D1.2, if the Court imposes the term of supervised release, that term shall be at least 1 year but not more than 3 years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including

imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.  ENTIRE AGREEMENT

This document states the parties' entire agreement.  There are no other promises, agreements, (or "side agreements"), terms, conditions, understandings or assurances, express or implied.  In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: _03·15·2024_

Timothy Taconi
Defendant

Date: _3-15-2024_

Martha H. Eskesen
Attorney for Defendant

Date: _3|20|24_

Leah Perczak
Special Assistant U.S. Attorney

Date: _3 | 20 | 24_

Rebecca S. Weber
Assistant U.S. Attorney